**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

KATHERINE JACOBS,                    )
                                     )
        Plaintiff(s),                )
                                     )
        vs.                          )        Case No. 4:18-cv-00024-SRC
                                     )
JOHNSON STORAGE & MOVING             )
CO. HOLDINGS, LLC,                   )
                                     )
        Defendant(s).                )

**MEMORANDUM AND ORDER**

This matter comes before the Court on the [61] Motion for Summary Judgment of

Defendant Johnson Storage & Moving Co. Holdings, LLC and [79] Johnson Storage's Consent

Motion to Continue Trial.  For the reasons set forth below, the Court grants the Motion for

Summary Judgment, and denies the Motion to Continue Trial as moot.

**I.      FACTS AND BACKGROUND**

This case arises from the events leading up to Plaintiff Katherine Jacobs's termination

from Johnson Storage, where she worked from March 2017 to August 2017.  Jacobs claims that

Johnson Storage terminated her because she would not under-report her working hours to avoid

accruing overtime, and in retaliation for complaining about Johnson Storage's overtime-pay

practices.  Johnson Storage maintains that while Jacobs recorded far more overtime hours than

authorized, the company nonetheless paid her for all overtime she recorded and terminated

Jacobs for poor performance.  The summary judgment record establishes the following

uncontroverted facts.

### A.    Johnson Storage

Johnson Storage is a moving and storage company that handles residential, military, domestic, and international moving.  Johnson Storage's International Through Government Bill of Lading ("ITGBL") department handles international military moves.  Throughout her time working for Johnson Storage, Jacobs's job title was "ITGBL coordinator/analyst."  In that role, Jacobs coordinated moves for military members.  Johnson Storage hired Jacobs as part of the team to set up the ITGBL department.

Tina Heaney is the Director of Military Services at Johnson Storage.  The ITGBL department that Heaney oversaw consisted of three employees: Jacobs, Heaney, and Diana Miller.  Jacobs and Miller had the same job title and reported to Heaney.

### B.    Jacobs's Hiring

Jacobs previously worked in the military ITGBL department of another company.  At Johnson Storage, Jacobs worked remotely from home.  Johnson Storage offered Jacobs the position of ITGBL coordinator/analyst earning a base rate of $29 per hour.  Jacobs accepted the offer on February 28, 2017 and began employment two weeks later.

### C.    Jacobs's Knowledge of Johnson Storage's Policies

On her first day on the job, Jacobs received a copy of the Johnson Storage Employee Handbook.  Jacobs understood that the Employee Handbook set forth the policies that applied to her employment and that she was an at-will employee.  She also understood that Johnson Storage classified her as a "non-exempt employee" and that Johnson Storage's policy was to pay her one and one-half times her regular rate for hours worked over 40 in a week.  The "Overtime" Policy in the handbook expressly provides: "Non-exempt employees may work overtime only with prior

approval of their supervisor/manager.  Employees working overtime without supervisor approval

may face disciplinary action."  Johnson Storage's "Time Reporting" Policy provides:

> Non-exempt employees must record time worked on a daily basis.  Non-exempt
> employees must:
>
> i.        clock in, using the company designated time keeping system, at the start of
> their shift and when they return to work from lunch.
>
> ii.       clock out, using the company designated time keeping system, when they
> go to lunch and at the end of their shift.
>
> …
>
> At the conclusion of each pay period (15th and the last day of the month),
> employees must check their timecards for accuracy.  When employees forget to
> clock in/out for their shift or before/after their meal period, they must notify their
> supervisor/manager immediately.  Their supervisor will then make the correction
> in the time keeping system.  Supervisors must make corrections and approve the
> time sheets of their non-exempt employees within three business days after the
> close of pay period (the 15th and the last day of the month).

Doc. 75 at ¶ 39.

### D.      Payment for Recorded Hours

Jacobs recorded her own time by punching in and out through a time-tracking program on

her computer.  If Jacobs missed a punch, she would call or email Heaney and tell her what time

should be entered for the missed punch.  Jacobs received check stubs during her employment

with Johnson Storage that advised her of her earnings, including the hours and the rate of pay.

Jacobs admits that Johnson Storage paid her for all hours she recorded, and that whenever Jacobs

recorded more than 40 hours in a week, she received overtime pay for those hours.

### E.      Johnson Storage's Overtime Policy for Peak Season

Under Johnson Storage's policy, no one is authorized to work overtime outside of peak

season, which begins May 15th, about two months after Jacobs began, and ends September 30th.

During peak season, Johnson Storage authorized Jacobs and Miller to each work up to 10 hours of overtime per pay period.

Jacobs testified that Heaney told her overtime needed to be minimal and that Jacobs would be told when she could log overtime.  Jacobs further testified that Heaney told her she needed "to stop logging in overtime hours."  Other than her first week and a vacation week, Jacobs recorded overtime every week of her employment.  During the 22 weeks Jacobs worked for Johnson Storage, she recorded 171.71 total hours of overtime, an average of 7.805 hours of overtime per week.  Jacobs recorded more than ten overtime hours in ten of the workweeks, despite only being authorized to work ten hours of overtime per pay period during peak season.  During the last three full workweeks before her termination, Jacobs recorded an average of 19.39 hours of overtime per workweek.  In contrast, Jacobs's peer, Miller, worked some overtime but never exceeded the amount of overtime authorized.

### F.      Heaney's Communications to Jacobs about Overtime

Heaney had multiple conversations with Jacobs about the amount of overtime she recorded.  The first occurred after Jacobs received her first or second paycheck.  According to Jacobs, the check reflected a small amount of overtime, and Heaney said to her, "we will tell you when you can log in overtime hours."  Jacobs testified that, at some point, Heaney told her not to log in overtime hours and to watch the overtime.  When asked if anyone at Johnson Storage told her to work time and not report it, Jacobs testified she would ask Heaney for help and would communicate that she could not get the required work done in eight hours and "the only response was, you need to continue – or you need to stopping logging in the hours."  Jacobs subjectively understood these conversations to mean she should work hours and not record them.  To Heaney's knowledge, Johnson Storage paid Jacobs for all of the hours she worked.

4

On July 6, 2017, Heaney and Jacobs spoke about the hours Jacobs was working. According to Jacobs, during this call Heaney instructed Jacobs "not to log in [her] overtime hours."  Jacobs testified that she understood this directive to mean she should keep doing the work, but not record the time.  Jacobs followed up on her July 6, 2017 phone call with Heaney with an email sent the next day.  In the email, Jacobs expressed her belief that she could not complete her job duties without incurring overtime: "If I cut the hours then I will surely start to see service failures because I won't be able to respond to the emails in time."  Jacobs continued: "I guess I'm a little confused about cutting my hours but not having anyone to send the overflow work to.  If I stop the hours, then I'm going to have a mess on my hands."  Finally, Jacobs stated: "I am seriously not complaining about the volume because I understand it is the season but I don't know how to cut the hours and get all of this done.  The only other thing I could do is clock out and continue to do the work but we have already had conversations about that."  Doc. 75 at ¶ 143.

### G.      Heaney's July 11, 2017 Email to Human Resources

On July 11, 2017, Heaney sent an email to Johnson Storage's Human Resources Director, Marina Manandhar, regarding Jacobs.  In the email, Heaney outlined issues she observed in her interaction with Jacobs, including that Jacobs did not respect her role as supervisor, was defiant and did not follow direction, did not appear teachable, and rarely answered her phone calls. Heaney stated: "At this point in time, there is not a failure in job performance in the sense that there have not been service failures."  Heaney noted that Jacobs's workload was identical to Miller's and that Miller was able to accomplish the job with minimal overtime.  Heaney also noted that less than a week after she communicated to Jacobs that she was not allowed to have more than ten overtime hours per pay period, Jacobs had already exceeded the limit.  Heaney

stated: "On July 5th I brought to her attention that her overtime was way out of line and she is not allowed to have more than 10 hours per pay period.  I directed her to evaluate her hours and work load every Thursday and send me a list of things she will not be able to complete within the time restriction and I will complete those tasks."  Heaney expressed to Manandhar that she intended to write up Jacobs for exceeding the overtime limit but also noted that the situation was "unsustainable" and that she "had already started thinking about how to begin the process of hiring a replacement."  Doc. 75-7.

### H.    Diana Miller's Complaints about Jacobs

Jacobs's co-worker and peer, Diana Miller, communicated to Heaney that she was frustrated that she was the go-to person for agents when Jacobs would fail to respond.  Heaney told Miller that if she wanted her to intervene, she needed specifics; Miller then forwarded to Heaney multiple emails from agents/vendors demonstrating Jacobs's failure to respond.

### I.    M. Dyer's Complaint about Jacobs

In early August 2017, a manager for a key business partner of Johnson Storage sent an unsolicited email to Heaney concerning Jacobs.  The business partner, M. Dyer & Sons, was Johnson Storage's agent in Hawaii.  As agent, M. Dyer handled packing, loading, delivery, and storage for Johnson Storage as well as working with the ports in Hawaii.  Because of the military installation there, Hawaii played a pivotal role in Johnson Storage's business.  Jacobs acknowledges M. Dyer's importance to Johnson Storage.

In her email, the M. Dyer manager told Heaney that Jacobs had acted in a "curt, unprofessional manner."  She described Jacobs's "yelling" at her, "barking" at her team, and "ranting and raving."  She told Heaney: "We will continue to partner with [Jacobs] in a very professional manner and ask that she afford us the same."

6

**J.      Jacobs's Termination**

On August 17, 2017, Heaney and Manandhar called Jacobs and informed her that

Johnson Storage was terminating her employment.  Without Heaney or Manandhar's knowledge,

Jacobs recorded the telephone call, during which Heaney told Jacobs:

> So the first item that -- that I want to bring to your attention is that we had a
> conversation in early July about overtime and we talked about ten hours of
> overtime per pay period and that you were to evaluate your workload and your
> hours on Thursday and communicate with me what you weren't able to complete
> so that we could evaluate how to -- how to accomplish your job in the amount of
> hours that were allowed.  And since then, the three pay periods since then, the
> first one directly after that you've had 17.13 overtime hours.  The following pay
> period you had 20.4 overtime hours.  And this last pay period you had 37.77 hours
> of overtime.

Doc. 75 at ¶ 109.  Heaney continued:

> And then the next thing on my list is last week we had three complaints from M.
> Dyer about your interactions with their staff.  The words that they used -- I'm
> quoting exact words -- that you were -- that you yelled at them, that you were
> ranting and raving, that you were belligerent and unprofessional.  And so I need to
> point out that we're in a customer service business and that our partners, our
> agents, our members, are all our customers.  And in this case, it seems as though
> you failed with -- with regard to M. Dyer. And then we've received several e-
> mails, Diana and I, requesting paperwork or information from more than one
> place stating that -- that they've had second and third requests to you and not been
> responded to.  And so with all of -- with all of this, I've decided to terminate your
> employment as of today.

*Id.*  The same day, Heaney documented the reasons for Jacobs's termination in a letter.

**K.      Jacobs's Calculation of Unpaid Overtime**

Jacobs claims that she consistently worked more hours than she recorded.  Jacobs does

not know whether there is any week during her employment with Johnson Storage in which her

recorded hours accurately reflect all the hours she worked; could not explain how she decided

how many hours she was going to record in a week; and does not have any records showing

whether the time she reported actually reflects all the hours she worked.

Jacobs, with her attorney, came up with an estimate of the hours she worked but did not record.  Jacobs did not review any contemporaneous notes to come up with her estimate.  Instead, Jacobs based her estimate on her recollection and "just knowing how much time [she] was putting in on an average."  The only documents Jacobs reviewed in determining her estimate were her paychecks from Johnson Storage.  Plaintiff claims that she worked a total of 129 unrecorded overtime hours.

### L.      Jacobs's Alleged Protected Activity

In addition to her conversations with Heaney, Jacobs spoke to three individuals at Johnson Storage about overtime before her termination: Don Hindman, John Hiles, and Clark Zabokrtsky.  Jacobs had only one overtime-related conversation with each of these three individuals; Jacobs has no firsthand knowledge whether these conversations had anything to do with her termination.

Jacobs spoke with Heaney about overtime on at least four occasions between May and July 2017.  Jacobs testified that Heaney told her not to log in overtime hours, and that Jacobs responded, "I'm working more than an eight hour day, how is that legal?"

Jacobs called Hindman in May or June 2017.  Jacobs testified that her main reason for calling Hindman was to tell him that she needed more than eight hours a day to do her job and that Heaney had told her to reduce her overtime.  Jacobs claims that she told Hindman about being "asked to under-report my hours" and "being asked to not log in the hours I was working."

Jacobs called Hiles the week after she spoke to Hindman and recounted the conversation: "We were talking about work and then I told him that I had a conversation with [Heaney] about overtime and not logging in overtime.  That was pretty much when he said, Yeah, Don Hindman called me saying you had call[ed] him bitching about overtime."

Jacobs spoke with Zabokrtsky, the general manager of Johnson Storage's Kansas City branch, in July 2017.  During this conversation, Jacobs told Zabokrtsky that she was working more than eight hours a day and was asked not to log in her hours.

### M.    Jacobs's Post-Termination Communications with Hindman

After her termination, Jacobs emailed Hindman, stating:

> [Heaney] said she was firing me because of the overtime hours. In the aforementioned email attachments, I asked for help to reduce the hours (without success). I also offered several suggestions that would help reduce the workload (without success or even a follow up phone call or email). At one point I asked Tina if she was asking me to work the hours and not report them and she said, "I can't technically ask you to do that." If you are limiting my overtime and not offering any help, then I am being set up for failure. And, my being fired can only be explained as retaliation for failing to perform an act which is to show 10 hours of overtime each pay period when I am being given me far more work than can be accomplished within that time. From my research this could be a violation of the wage and hours laws.

Doc. 75 at ¶¶ 177-78.

A few days after receiving Jacobs's email, Hindman called Jacobs.  During the call, Hindman related his varying viewpoints that her termination was "not performance related" or "for cause[;]" that he thought she was a "very qualified person[;]" that Heaney "felt, rightly or wrongly, she felt like you weren't taking her direction and she felt like you were insubordinate[;]" and that he "truthfully [did not] know why [Heaney] felt that way" but also stated that "with my workload, I just don't have time to, like, dig into every personnel issue because we have too many."  Finally, Hindman told Heaney that Johnson Storage would not contest a claim for unemployment and offered to give Jacobs a positive reference.

## II.    STANDARD

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin.,*

*Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)).   The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).   The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25.   In response to the proponent's showing, the opponent must "come forward with 'specific facts showing that there is a genuine issue for trial.'"   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).   A "genuine" dispute of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586.   "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable...or is not significantly probative...summary judgment may be granted." *Id.* at 249–50 (citations omitted).

## III.   DISCUSSION

Jacobs asserts four claims against Johnson Storage: Count I, for retaliation in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.;  Count II, a Missouri state-law claim for wrongful discharge in violation of public policy; and, Counts III and IV, for failure to pay overtime in violation of, respectively, FLSA and the Missouri Minimum Wage Law (MMWL), Mo. Rev. Stat. § 290.500, *et seq*.

A.      **FLSA Retaliation (Count I)**

FLSA makes it unlawful to discharge an employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding ..., or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3).  In *Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011), the Supreme Court found that the statutory term "filed any complaint" included oral complaints as well as written complaints, meaning that oral complaints to employers can serve as the basis of a FLSA retaliation claim.  *Id.* at 4.  Under the standard set out in *Kasten*, an oral complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and call for their protection" to find the employee engaged in the statutorily-protected activity of filing a complaint.  *Id.* at 14.

The Court analyzes a claim of FLSA retaliation under the burden-shifting framework established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *Grey v. City of Oak Grove, Mo*., 396 F.3d 1031, 1034 (8th Cir. 2005).  Under the *McDonnell Douglas* burden-shifting framework, a plaintiff has the initial burden of establishing a prima facie case of retaliation.  *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011).  To establish a prima facie case of retaliation, the plaintiff must show that "(1) she participated in a statutorily protected activity, (2) the [employer] took adverse employment action against her, and (3) there was a causal connection between [plaintiff]'s statutorily protected activity and the adverse employment action."  *Montgomery v. Havner*, 700 F.3d 1146, 1149 (8th Cir. 2012).  "If an employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action."  *Fercello v. Cty. of Ramsey*, 612 F.3d 1069,

1078 (8th Cir. 2010).  If the employer does so, "the burden then shifts back to the employee to put forth evidence of pretext, the ultimate question being whether a prohibited reason, rather than the proffered reason, actually motivated the employer's action." *Id.*  In addition, a plaintiff alleging retaliation must demonstrate that the adverse employment action would not have occurred "but for" the retaliatory motive.  *Spencer v. Barton Cty. Ambulance Dist.*, No. 16-05083-CV-SW-RK, 2017 WL 7036658, at *4 (W.D. Mo. Sept. 13, 2017) (citing *University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 359 (2013)).

Johnson Storage moves for summary judgment on Jacobs's FLSA retaliation claim on two independent grounds.  First, Johnson Storage argues that Jacobs cannot establish even a prima facie case of retaliation because she did not engage in any protected activity.  Second, Johnson Storage argues that, even if Jacobs could establish a prima facie case, Johnson Storage has put forth legitimate, non-retaliatory reasons for her termination and Jacobs cannot show that those reasons are pretextual.

Jacobs asserts that she engaged in protected activity when she complained to Heaney, Hiles, and Hindman "regarding her overtime hours and [Johnson Storage's] overtime policies."  Doc. 74 at 13.  Johnson Storage argues that Jacobs's oral complaints fall short of *Kasten's* "clear and detailed" requirement.  Doc. 62 at 6-7.  The Court need not decide whether Jacobs's oral complaints constituted protected activity because—even assuming Jacobs could make a prima facie case—she cannot show that Johnson Storage's legitimate reasons for her termination were pretextual.  *See Riser v. Target Corp.*, 458 F.3d 817, 820-21 (8th Cir. 2006) (where employer has proffered legitimate, non-discriminatory reasons for adverse employment action, court may skip analysis of prima facie case and move directly to question of discrimination *vel non*).

12

Johnson Storage undisputedly offered legitimate, non-retaliatory reasons for Jacobs's termination.  During the telephone call in which Heaney told Jacobs of her termination, Heaney articulated three reasons for the discharge: (1) Jacobs's working unauthorized overtime, (2) complaints from M. Dyer about Jacobs's unprofessional conduct, and (3) Jacobs's unresponsiveness to emails from agents/vendors.  Doc. 75-13.  Heaney listed the same three reasons in the termination letter to Jacobs.  Doc. 75-12.  Jacobs does not dispute that Johnson Storage could legally terminate her employment for any of these three reasons.  *See* Doc. 74 at 17 (acknowledging that "poor performance" is a legitimate reason for termination); s*ee also Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 716-17 (8th Cir. 2011) (recording overtime hours where such hours are unauthorized is insubordination, and not protected by FLSA).  Thus, because Johnson Storage has put forth legitimate reasons for her termination, Jacobs bears the burden to show those reasons were pretextual.  *Grey*, 396 F.3d at 1035.

Jacobs argues that she has presented sufficient evidence to create a genuine issue of material fact that Johnson's Storage's articulated reasons for her termination were pretext for retaliation.  Doc. 74 at 15-16.  First, Jacobs argues that Johnson Storage has offered shifting and inconsistent reasons for her termination.  "Pretext may be shown with evidence that the employer's reason for the termination has changed substantially over time."  *Loeb v. Best Buy Co.*, 537 F.3d 867, 873 (8th Cir. 2008).  Further, "[i]f the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination."  *Id.* (quoting *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107 (8th Cir. 2000)).

As evidence that the articulated reasons for her termination are false and have shifted over time, Jacobs points to her post-termination phone call with Hindman, Johnson Storage's

13

General Counsel.  During that call, Hindman told Jacobs he considered her a "very qualified person" and that her termination was "not performance related" or "for cause."  Doc. 75-14. Jacobs argues that Hindman's comments demonstrate inconsistency in Johnson Storage's rationale for her termination.  However, in the same call, Hindman stated that Heaney felt Jacobs "[was not] taking direction" and was "insubordinate."  *Id.*  Hindman acknowledged that he "did not know why [Heaney] felt that way" because he did not have time to personally investigate every personnel issue.  *Id.*  Further, Hindman's comments that Jacobs's termination was "not performance related" or "for cause" came in the context of his representation that Johnson Storage would not oppose Jacobs's claim for unemployment.

Jacobs also relies on a Notice of Decision from the Colorado Department of Labor and Unemployment, finding "based on information received" that Jacobs was laid off from Johnson Storage "due to a lack of work," and therefore eligible for unemployment benefits.  Doc. 75-15. The document does not disclose anything about where the tribunal obtained its information, so it cannot evidence inconsistency in *Johnson Storage's* rationale for Jacobs's termination. Furthermore, this finding is wholly consistent with Hindman's representation that Johnson Storage would not oppose Jacobs's claim for unemployment.  Doc. 75-14.  Accordingly, Hindman's comments do not evidence that Johnson Storage's articulated reasons for Jacobs's termination were false or shifted over time.

Jacobs next argues that Johnson Storage's proffered reasons for her termination are pretextual because there is no evidence of poor performance.  This argument lacks merit.  When Heaney sent her email to Manandhar on July 11, 2017, she noted that Jacobs was insubordinate, frequently unresponsive, and that she repeatedly recorded unauthorized overtime.  Thus, about

five weeks before terminating Jacobs, Heaney described two of the three performance issues that Heaney would cite as the reasons for Jacobs's termination.

Further, Jacobs does not dispute that shortly before her termination, Johnson Storage's key business partner M. Dyer complained to Heaney about Jacobs's "curt, unprofessional manner". Doc. 75 at ¶ 98. Nor does Jacobs dispute that both her peer, Diana Miller, and agents/vendors of Johnson Storage made other unsolicited complaints about Jacobs to Heaney before her termination. Doc. 75 at ¶¶ 84-89. To the extent Jacobs argues that there is no evidence of *actual* poor performance because these complaints were inaccurate or unsubstantiated, she misunderstands the evidentiary burden. *See Grey*, 396 F.3d at 1035 ("The question is whether appellees' articulated reasons for discharge were a pretext for retaliation, not whether appellant actually did what he was accused of doing or whether discharge was warranted."); *see also Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 883 (8th Cir. 2005) ("We do not 'sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination or unlawful retaliation.'") (quoting *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005)). In sum, the record contains substantial evidence documenting the very performance issues for which Johnson Storage terminated Jacobs.

Jacobs attempts to discount the complaints Johnson Storage received about her performance after July 11, 2017 by arguing that Heaney had already made the decision to terminate her by then. Doc. 74 at 18-20. Jacobs argues that the subsequent complaints evidence a Heaney-engineered campaign to document her deficiencies to justify Heaney's already-made decision. *Id.* Jacobs's argument fails for at least two reasons. First, the evidence does not support Jacobs's contention that Heaney had already made the decision to terminate her by July

15

11, 2017.  In her email to Manandhar on that date, Heaney stated "I have already *started thinking* about how to begin the process of hiring a replacement, however I want to make sure I handle it in a way that is legal and doesn't hurt the company." Doc. 75-7 (emphasis added).  Heaney's statement that she had "started thinking" about hiring Jacobs's replacement does not show Heaney had already made the decision.  Second, no evidence suggests Heaney solicited any of the complaints Johnson Storage received from its agent and vendors, and Jacobs admits that these complaints came unsolicited.  Doc. 75 at ¶ 89, 99.  Thus, the evidence shows that Heaney was already dissatisfied with Jacobs's performance on July 11, 2017, and that she received multiple unsolicited complaints about Jacobs after that date.

Finally, Jacobs argues that the temporal proximity between her complaints and her termination is evidence of pretext.  Doc. 74 at 20.  Contrary to Jacobs's assertion, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).  By her own admission, "Jacobs first complain[ed] to Ms. Heaney in approximately April 2017."  Doc. 74 at 21.  Johnson Storage terminated Jacobs's employment in August 2017—some four months after her first complaint.  The Court finds this timing insufficient to show pretext.  *See Kipp v. Missouri Highway & Transp. Comm'n.*, 280 F.3d 893, 897 (8th Cir. 2002) (interval of two months "so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff]'s favor on the matter of causal link"); *see also Arraleh v. Cty. of Ramsey*, 461 F.3d 967, 978 (8th Cir. 2006) (in absence of other evidence of pretext, three-week interval insufficient to create genuine factual issue).

16

Further, even if the four-month interval between Jacobs's complaints and her termination could evidence pretext, intervening events "'erode any causal connection' suggested by temporal proximity." *Cheshewalla v. Rand & Son Const. Co*., 415 F.3d 847, 852 (8th Cir. 2005) (quoting *Kiel*, 169 F.3d at 1136). Here, Heaney undisputedly received multiple unsolicited complaints about Jacobs between April 2017 and her termination in August 2017. And Jacobs does not dispute that, after her complaints, she continued to record more overtime than authorized. These intervening events also defeat Jacobs's claim of causal connection.

In sum, the Court finds no evidence from which a reasonable jury could determine that Johnson Storage's stated reasons for Jacobs's termination were pretextual. Accordingly, the Court grants summary judgment for Johnson Storage on Jacobs's FLSA retaliation claim (Count I).

**B.     Wrongful Discharge in Violation of Missouri Public Policy (Count II)**

Missouri follows the general rule "that an at-will employee may be terminated for any reason or no reason[.]" *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. banc 2010). Because Jacobs's claim arose before the effective date of Missouri's Whistleblower Protection Act, Missouri common law governs Jacobs's claim. *Meehan v. PNC Fin. Servs. Grp., Inc.*, No. 4:17-CV-2876 PLC, 2018 WL 2117655, at *5 (E.D. Mo. May 8, 2018). Missouri common law included a public-policy exception, which prohibited termination of an at-will employee for either: (1) "refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body"; or (2) "reporting wrongdoing or violations of law to superiors or public authorities, also known as 'whistleblowing.'" *Newsome v. Kansas*

*City, Mo. Sch. Dist.*, 520 S.W.3d 769, 777 (Mo. Banc 2017) (quoting *Fleshner*, 304 S.W.3d at 92).

Jacobs claims that Johnson Storage wrongfully terminated her both for refusal to violate the law and for whistleblowing.  The Court first considers Jacobs's common-law whistleblowing claim.

### C.    Discharge for Whistleblowing

To prevail on this claim, Jacobs must demonstrate that: "(1) she reported serious misconduct that constituted a violation of the law and of well-established and clearly-mandated public policy; (2) her employer discharged her; and (3) her report causally contributed to the discharge."  *Yerra v. Mercy Clinic Springfield Communities*, 536 S.W.3d 348, 351 (Mo. App. S.D. 2017).  Jacobs's complaints to Heaney do not constitute whistleblowing under the Missouri common law public policy exception, because, as this Court previously found, "a report of wrongdoing to the wrongdoer is insufficient to invoke the whistleblowing public policy exception."  Doc. 13 at 5-6 (quoting *Drummond v. Land Learning Found.*, 358 S.W.3d 167, 171 (Mo. App. 2011)).

Johnson Storage argues that Jacobs cannot show that her complaints to Hindman, Hiles, or Zabokrtsky causally contributed to her termination.  Doc. 62 at 16.  Jacobs admits that she had one only one conversation each with Hindman, Hiles, and Zabokrtsky about overtime before her termination.  Jacobs called Hindman in May or June 2017 to tell him that she needed more than eight hours a day to do her job and that Heaney had told her to reduce her overtime.  Jacobs testified that she told Hindman she was being "asked to under-report my hours" and "being asked to not log in the hours I was working."  Jacobs testified that she called Hiles the week after she spoke to Hindman and told him about "not logging in overtime."  Jacobs spoke with

18

Zabokrtsky in July 2017 and told him that she was working more than eight hours a day and had been asked not to log in her hours.

Regarding Jacobs's calls to Hiles and Zabokrtsky, the Court finds no evidence from which a reasonable jury could infer that these complaints were a contributing factor in Jacobs's termination. Jacobs does not dispute that Heaney was the decisionmaker who ultimately decided to terminate her employment. *See* Doc. 74 at 20, 21. No evidence suggests that Heaney was even aware of Jacobs's complaints to Hiles or Zabokrtsky, much less that these complaints influenced her decision to terminate Jacobs.

Conversely, some evidence could indicate that Hindman influenced Heaney's decision to terminate Jacobs. A few days before Heaney terminated Jacobs, Heaney discussed Jacobs's performance with Hindman, telling Hindman she intended to give Jacobs a disciplinary write-up. Hindman replied: "I don't know why you're messing around with this. Just terminate her." Doc. 75 at ¶ 103. Thus, Jacobs complained to Hindman in May or June that Heaney was asking her to under-report hours, then Hindman told Heaney on August 13 to "just terminate" Jacobs, which Heaney did four days later.

However, no evidence indicates that Hindman told Heaney about Jacobs's complaint to him—on August 13 or at any other time. Nor does any evidence support a reasonable inference that Jacobs's complaint in May or June influenced Hindman's advice to Heaney in August to "just terminate" Jacobs. Jacobs herself admitted that she has no personal knowledge that her complaint to Hindman had anything to do with her termination. Doc. 75 at ¶ 184. Thus, the only "evidence" of a causal relationship between Jacobs's complaint to Hindman and her termination is that the one preceded the other by two or three months. Unlike the "but for" causation standard of a FLSA retaliation claim, Jacobs need only show that her complaint to

19

Hindman was a "contributing factor" in her termination.  *Fleshner*, 304 S.W.3d at 95.  Even

under this more lenient standard, Jacobs has presented insufficient evidence to withstand

summary judgment.  The Court finds here that the temporal proximity between the complaint

and adverse action—in the absence of any other evidence of a causal relationship—does not

create a genuine issue of material fact on the issue of causation.  Accordingly, the Court grants

Johnson Storage's motion for summary judgment on Jacobs's Missouri common law

whistleblowing claim.

### 2.    Discharge for Refusal to Perform an Illegal Act

Jacobs separately argues that Johnson Storage wrongfully discharged her in violation of

Missouri public policy for refusing to violate the law.  To come within this "narrow category of

protected employees," Jacobs must show, first, that Johnson Storage directed her to engage in

conduct that "violated a statute, constitutional provision, or regulation adopted pursuant to

statute."  *Bartis v. John Bommarito Oldsmobile-Cadillac, Inc.*, 626 F. Supp. 2d 994, 1000 (E.D.

Mo. 2009).  Second, Jacobs must show that she "was discharged for [her] refusal to perform the

unlawful act."  *Id.*

Jacobs alleges that Heaney directed her to violate the law by instructing her to under-

report her working hours.  Johnson Storage argues for summary judgment because "the

undisputed facts establish that Ms. Heaney did not direct Plaintiff to underreport her hours."

Doc. 62 at 13.  The Court agrees.  At most, the evidence shows Jacobs had *a subjective belief*

that Heaney wanted her to work more hours than she reported.  The record contains no objective

evidence that Heaney ever actually gave Jacobs such an instruction.  During her deposition,

Jacobs testified repeatedly that Heaney instructed her not to log in overtime hours.  Doc. 75-1 at

87:9-15; 90:10-15; 219:17-220:17.  However, when asked directly whether Heaney ever

instructed her to work off the clock, Jacobs testified:

> Q      Did [Heaney] ever give you an explicit instruction to work off the clock?
>
> A      She told me not to log in the hours.
>
> Q      Did she also say to work the hours and not log them in or did she just say not to log in the hours?
>
> A      There was no instruction to not do the work.  The instruction was always not to log in the hours.
>
> Q      How many times did she give you the instruction not to log in the hours?
>
> A      When we would talk – pretty much the majority of the time when I would have a conversation with her, it was – you know, I would ask for help. It was the same routine. I'm being told I need to reduce your hours. You need to stop logging in hours. I – I'm on a salary and I know they want me to help but that's not going to happen.  And just a number of responses.
>
> Q      So did she ever tell you to continue working and not log the hours?
>
> A      Isn't – I believe that's what I just said. She told me not to log in the hours, I asked for help, and she would say back that there's no help coming.

Doc 75-1 at 219:17-220:17.

Jacobs's subjective belief that Heaney was instructing her to work off the clock does not

create a genuine issue of fact.  In *Bazzi v. Tyco Healthcare Grp., LP*, 652 F.3d 943, 948 (8th Cir.

2011), the Eighth Circuit upheld summary judgment for an employer on a Missouri common-law

claim of wrongful discharge for refusal to violate the law.  The appeals court agreed with the

district court's finding that the employee had failed to create a genuine issue of fact where he

"failed to offer even a scintilla of admissible evidence" showing that the employer's conduct at

issue was a "clear violation" of the law.  *Id.* (citing *Margiotta v. Christian Hosp. Ne. Nw.*, 315

S.W.3d 342, 348 (Mo. 2010); *see also Zasaretti-Becton v. Habitat Co. of Missouri, LLC*, No.

4:12 CV 587 DDN, 2012 WL 2396868, at *8 (E.D. Mo. June 25, 2012) ("a reasonable belief of

legal wrongdoing is not itself sufficient to succeed on an unlawful termination claim brought

under Missouri's public policy exception to the at-will employment doctrine"). Thus, Jacobs must show more than that Heaney instructed her to not "log in" overtime hours and that she subjectively *understood* this as a directive to under-report her hours. Jacobs must show that Heaney actually instructed her to under-report her hours, in "clear violation" of FLSA and the MMWL. *Bazzi*, 652 F.3d at 948. The summary judgment record shows the opposite.

In her deposition testimony, Jacobs repeatedly stopped short of stating that Heaney instructed her to work off the clock. Doc 75-1 at 219:17-220:17. During the telephone call when Heaney informed Jacobs of her termination (which Jacobs surreptitiously recorded), Heaney told Jacobs:

> [W]e talked about ten hours of overtime per pay period and that you were to evaluate your workload and your hours on Thursday and communicate with me what you weren't able to complete so that we could evaluate how to – *how to accomplish your job in the amount of hours that were allowed.*

Doc. 75 at ¶ 109 (emphasis added). And in Jacobs's post-termination email to Hindman, she stated: "While I was not happy working 10-11 hour days, I was not going to let the customer's [sic] down by working 8-9 hour days which would result in service failures. … I worked 10-11 hour days out of necessity." Doc. 75-2. Jacobs's email to Hindman continued: "At one point I asked [Heaney] if she was asking me to work the hours and not report them and she said 'I can't technically ask you to do that.'" *Id.* In sum, Jacobs has identified no evidence showing that Heaney instructed her to under-report her hours.

Nor does it matter that Jacobs believed her job duties could not be completed in 40 hours. In *Ritchie*, the plaintiff specifically alleged that her work duties required more than 40 hours in a week and therefore required overtime. 630 F.3d at 716. Nevertheless, the Eighth Circuit affirmed dismissal because the employer had not authorized overtime. *Id.* At 716-17. Thus, "her recording of her overtime could be nothing more than mere insubordination, she having been

22

instructed to the contrary." *Id.* Further, the plaintiff's allegation that her employer instructed her to "stop recording overtime" did not, standing alone, allege misconduct, since the employer "could merely have been instructing [plaintiff] to complete the work required by the job within a 40-hour workweek and to stop working overtime altogether." *Id.* At 717 n.2. Similarly, Jacobs's testimony that Heaney directed her to "stop logging overtime" does not, standing alone, show that Heaney instructed Jacobs to under-report hours.

Jacobs has failed to raise a genuine issue of material fact as to whether Johnson Storage instructed her to violate the law by under-reporting her hours. Accordingly, the Court grants Johnson Storage's motion for summary judgment on Jacobs's claim of wrongful discharge for refusal to violate the law in violation of Missouri public policy (Count II).

### C. Failure to Pay Overtime in Violation of FLSA (Count III) and MMWL (Count IV)

Under section 7 of FLSA, an employer may not subject non-exempt employees to a work week in excess of forty hours without paying overtime of at least one and one-half times the regular hourly wage. 29 U.S.C. § 207. An employer who violates this restriction "shall be liable to the employee or employees affected in the amount of their ... unpaid overtime compensation ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Under the MMWL, "[n]o employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." Mo. Rev. Stat. § 290.505. The MMWL explicitly provides that this provision "shall be interpreted in accordance with the Fair Labor Standards Act, 29 U.S.C. Section 201, et seq." *Id.* Accordingly, the Court may jointly consider Jacobs's claims for unpaid overtime under FLSA and the MMWL. *Anderson v. Creve Coeur Urgent Care LLC*, No. 4:16CV2136 HEA,

2019 WL 4643954, at *3 n.1 (E.D. Mo. September 24, 2019); *Tolentino v. Starwood Hotels & Resorts Worldwide, Inc.*, 437 S.W.3d 754, 757 n.3 (Mo. banc 2014).

To prevail on a claim for unpaid overtime, a plaintiff must show: (1) that she worked overtime hours that were uncompensated, and (2) that the employer "knew or should have known" that the plaintiff worked unpaid overtime. *Hertz v. Woodbury Cty., Iowa*, 566 F.3d 775, 781 (8th Cir. 2009). If an employer fails to keep accurate records of wages and hours, employees are not denied recovery under FLSA simply because they cannot prove the precise extent of their uncompensated work. *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014). Instead, a "relaxed standard of proof" applies. *Id.* Under this evidentiary standard, "once the employee has shown work performed for which the employee was not compensated, and 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference,' the burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference." *Id.* (quoting *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013)). Here, the Court assumes without deciding that the relaxed standard of proof applies.

Johnson Storage argues that it is entitled to summary judgment on Jacobs's unpaid overtime claims on two independent grounds. First, Jacobs cannot show Johnson Storage knew or should have known that she worked unpaid overtime hours. Second, even under the relaxed standard of proof, Jacobs cannot meet her burden to show the amount of unpaid overtime as a matter of just and reasonable inference. *Holaway*, 771 F.3d at 1059.

The Court finds that Jacobs cannot show the amount of unpaid overtime as a matter of just and reasonable inference.[1] Jacobs claims that she worked a total of 129 hours of unpaid

---

[1] Jacobs's Opposition brief wholly fails to respond to Johnson Storage's argument that she cannot meet her burden to show the amount of unpaid overtime as a matter of just and reasonable inference. Failure to oppose a basis for

overtime.  Jacobs does not dispute that this number is an "estimate" based solely on her own recollection and on "just knowing how much time she was putting in on an average."  Doc. 75 at ¶¶ 121-22; Doc. 75-1 at 114:34-115:20. In arriving at her estimate, Jacobs did not consult any contemporaneous notes or other documents showing the amount of time she worked but did not report to Johnson Storage.  The only documents Jacobs relied on were her paycheck stubs from Johnson Storage.

In *Holaway*, the Eighth Circuit affirmed summary judgment for the employer on a FLSA unpaid overtime claim finding that the plaintiff failed to establish the amount of uncompensated work as a matter of just and reasonable inference.  771 F.3d at 1060.  The Court noted that the plaintiff had put forth "contradictory and bare assertions of his overtime hours worked" supported only by "vague testimony [that] failed to reference specific days and hours worked." *Id.* at 1059-1060.

The Court finds *Holaway* controls here.  As in *Holaway*, Jacobs only offers her own testimony to support her claim of 129 unpaid overtime hours.  During her deposition, Jacobs was twice asked to explain the basis of her estimate:

> Q      Did you – when you came up with the number that ultimately you and your prior counsel decided you worked and weren't paid for, did you look at any documents in coming up with that number?
>
> A.      No, other than just knowing how much time I was putting in on average.
>
> …
>
> Q      Okay.  So is it fair to say that the number you came up with was just your estimate based on your recollection?
>
> A      Mm-mm.
>
> Q      Is that a yes?

summary judgment may constitute waiver of that argument.  *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009).

25

A       Yeah, my recollection was included in there as well.

Q       Okay. Was anything included other than your recollection?

A       No.

Doc. 75-1 at 114:24-115:20.

Q       Where did you come up with these numbers?

A       So I initially worked them out based on looking at the paycheck and doing – I did it two weeks, and then I believe it was [Jacobs's prior counsel], he went over it and we worked on it together.

Q       Did you reference any documents other than your paycheck stubs to come up with this answer?

A       No, I had no other documents.

Q       You didn't have any sort of notes or anything like that?

A       No.

Doc. 75-1 at 207:14-25.  Jacobs's testimony is vague and does not reference specific days worked.  *Holaway*, 771 F.3d at 1060.  And Jacobs's reliance on her paycheck stubs to determine her estimate hurts rather than helps her claim.  Jacobs's paychecks reflected numbers of hours that she herself claims she reported inaccurately.  Doc. 75 at ¶¶ 45, 121-22.

Further, as in *Holaway*, Jacobs has offered "contradictory and bare assertions" of her overtime hours worked.  771 F.3d at 1059.  Jacobs based her claim of 129 unpaid overtime hours on her recollection of hours she allegedly worked but did not record during the period from March to August 2017.  Doc. 75-1 at 114:24-115:20; 208:1-209:25.  However, in her Opposition brief, Jacobs now asserts that she "accurately recorded her hours worked" from April to August 17, 2017.  Doc. 74 at 6.  Further, Jacobs concedes that she does not know if there is any week she worked for Johnson Storage where she accurately recorded all the hours she worked.  Doc. 75 at ¶ 149.  These representations are irreconcilably contradictory.  *See Holloway v. United States*, 960 F.2d 1348, 1358 (8th Cir. 1992) (self-contradicting statement is insufficient to create a

genuine issue of material fact).  Jacobs offers no revised calculation or other evidence from which a jury could determine Jacobs's allegedly unpaid overtime hours.

The Court also finds *Zhou v. Int'l Bus. Machines Corp.*, No. 15-CV-1027-LRR, 2017 WL 1217195 (N.D. Iowa Mar. 31, 2017), *aff'd*, 709 F. App'x 413 (8th Cir. 2018), instructive here.  In *Zhou*, the district court granted summary judgment for the employer because the plaintiff failed to offer evidence from which a jury could calculate a measure of unpaid hours worked as a matter of just and reasonable inference.  The plaintiff, who worked remotely and recorded his own hours, admitted that he did not keep notes contemporaneously as he worked and that he had no other objective evidence demonstrating the amount of overtime that he worked.  *Id.* at *21. The court found the record unclear as to how often the plaintiff worked overtime without claiming it, and how often he merely claimed less overtime than he worked.  *Id.*  The plaintiff testified that he "normally" worked twice the amount of overtime that he recorded, but the court found this calculation insufficient.

> [T]he only method that Zhou puts forth to demonstrate the extent of uncompensated time worked is based on mere approximation and Zhou admits that it was not consistently applied.  Without any evidence that Zhou employed this method with any more regularity than "[n]ormally," the court cannot conclude that a jury could find, as a matter of just and reasonable inference, an amount of hours that Zhou worked but for which he was not compensated. Zhou's contentions are unsupported by anything but his own self-serving statements, which in turn are unsupported by any evidence in the record.

*Id.*  As in *Zhou*, Jacobs has failed to offer any objective evidence to support her own self-serving estimate and approximation.  Accordingly, following *Holaway* and *Zhou*, the Court finds that Jacobs has not met her burden to produce "sufficient evidence to show the amount and extent of [uncompensated] work as a matter of just and reasonable inference."  *Holaway*, 771 F.3d at

1059.  The Court therefore grants summary judgment for Johnson Storage on Jacobs's claims of unpaid overtime under FLSA (Count III) and the MMWL (Count IV).[2]

Accordingly,

**IT IS HEREBY ORDERED** that [61] Johnson Storage's Motion for Summary Judgment is GRANTED.

**IT IS FURTHER ORDERED** that [79] Johnson Storage's Consent Motion to Continue Trial is DENIED as moot.

So Ordered this 3rd day of March, 2020.

_____

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

---

[2] Because the Court finds that Johnson Storage is entitled to summary judgment on Jacobs's unpaid overtime claims because Jacobs cannot show the amount of unpaid overtime as a matter of just and reasonable inference, the Court need not reach Johnson Storage's alternative argument for summary judgment on these claims, i.e., that Johnson Storage neither knew nor should have known that Jacobs was working unpaid overtime.